The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. Please be seated. This morning we will hear argument in Appeal No. 2010-1246, Adams Respiratory v. Perrigo Co. Mr. Cotton. Mr. Cotton. Yes. Please proceed. May it please the Court. This morning I'd like to discuss three issues. First, the meaning of the term equivalent. Second, Adams' evidence showing that in fact Perrigo's product is equivalent to the CMAX of an immediate release product and the case law associated with that. And third, the meaning of the phrase becomes fully bioavailable in the stomach. During the reexamination proceeding, Adams told the patent examiner that the word equivalent meant pursuant to the FDA bioequivalence range of 80 to 125 percent and nothing more. Nowhere does Perrigo cite to any place in the record where Adams ever said that equivalent included a 90 percent confidence interval or a head-to-head study. Well, to be clear, the language is equivalent as being the FDA bioequivalence guidelines of 80 to 125 percent. The nothing more language is your argument. That's not part of what was in the reexam. And I think that if I understand their argument, it is, well, when you reference the FDA bioequivalence, you're necessarily getting not only 80 to 125 percent but a 90 percent confidence interval. And so I think they're importing it through your reference to the FDA guidelines. Right, but there's two different ways that it was referred to in the file history. One way was, as you say, Judge Moore, the FDA bioequivalence guidelines of 80 to 125. That happened once. The other four times were that Adams made that representation. It was the FDA bioequivalent range of 80 to 125. And the range is important because that is the range that the FDA has determined as a matter of their medical judgment that if a generic product is within that range, they will be considered bioequivalent for the C-max. The 90 percent confidence interval doesn't relate to that medical judgment. What it relates to is whether the tablets the generic is making are consistent. It's more of a manufacturing issue than it is anything else because the FDA doesn't want to allow someone to have a C-max within that range but find out that the generic product has a product that is, you know, 50 percent or 150 percent. And they want to make sure that the generic product is consistently within the range. Here's the difficult concept for me in this case, which is this isn't your typical infringement case. So if we were in a typical infringement case, not in an ANDA-type situation, you would just show what percentage of the drugs they sold actually do, in fact, fall within the range. And then your damages would be based only on that percentage. You wouldn't be able to seek damages, and they would be free to sell the percentage of drugs that fell outside of that range because those would be non-infringing. But here, when we determine that there's infringement, you're going to be effectively getting an injunction against all of their product sales, including the ones that wouldn't infringe. So wouldn't that 90 percent confidence interval be sensible given the different circumstances of this case vis-à-vis the typical infringement suit? If you prevail, you get to stop them from selling anything, the infringing parts and the non-infringing parts, simply by proving, under your recommendation, a 51 percent standard. Well, Your Honor, I actually would take a little issue with the preface of all that, which is that in a normal patent case under this Court's precedent, if the infringer infringes some of the time, they're enjoying from selling the infringing product. Whether they fail to meet the limitations of their claims or not, they can't make an infringement product. Counsel, no, no, no. You're talking about when a product has multiple uses and one of them is infringing. But when you're talking about a product and some of the products infringe and some of the products don't infringe, you cannot possibly enjoin them from selling the ones that don't infringe. As a matter of practicality, that would stop them from making product because what you have here is if there's a small percentage of product that's outside the range, they're not going to manufacture hundreds of thousands of tablets and then say, oh, I'm going to dispose of 99,000 of them and keep the 1,000 to sell them. So I think that in this circumstance, where the real question here is whether Paraguay's product, as a matter of medical judgment, is their product equivalent to the C-max of an INR product. What do you say equivalent means? Right. You're saying what it does, telling us what it doesn't mean. Why don't you tell us now what it does mean in your view? Your Honor, it means if you run the test, the C-max of the generic product is 80 to 125% of the reference product. So in other words, you run a study and you compare the C-max of the generic product versus a reference. And if that C-max value is 80% of the reference product or 125% of the reference product or anywhere in between, that would be the equivalent. As I understand what you're saying, equivalent means within the range of 80 to 125 but nothing else. Correct. Equivalent means that the C-max value is in the range of 80 to 125 and that the confidence interval doesn't play a role in that. The way that the applicants define it in the reexamination, they clearly said 80 to 125. Nowhere in the record does it say with a 90% confidence interval or the additional limitation of having a head to head trial. If the intent was simply to include the 80 to 125% range, why was there any reference at all to the FDA bioequivalence standard? Your Honor, there's no dispute that the reason why that reference was attached was to provide a basis for the range itself. I mean, they didn't say 70 to 150. They said 80 to 125 because one skill in the art understands that as the FDA's medical judgment is that if you're in that range, you're equivalent. But if the specification of the patent in question only said 80 to 125% made no reference to the FDA bioequivalence standard, then your range would have been set forth with clarity. If you had that in the specification, it would have been set forth with clarity, but it also would have been consistent with what one skill in the art understood was the normal range in which a C-max must be between. I mean, that's the dilemma here because on the one hand, by saying, well, no, the patent only recites or calls for a range without the 90% confidence level or anything else, then it seems that that reference to the FDA bioequivalence standard is surplusage. On the other hand, if what you intended to incorporate was the entire FDA bioequivalence standard, then the 80 to 125% range seems to be conflicting or confusing. So there's an ambiguity here. Well, Your Honor, I think if they meant all the bioequivalent guidelines, they would have just stopped and said FDA bioequivalent guidelines and stopped. In other words, either way we construe it, there seems to be some surplusage. Well, I wouldn't call it surplusage. I mean, the expert could have just said 80 to 125, and then the examiner could have said, well, where did that come from? And he would have said, well, it came from the guidelines. I mean, as a practical matter, Parable sets no case which says whatever you submit to the PAC office for support of a range, that everything else gets incorporated into that claim limitation. I think that would be unworkable. How would you know what part of the guidelines are incorporated? Now, Parable says the 90% confidence interval should be incorporated. But there's other things in that guideline. They're not arguing that everything in the guideline get incorporated. They're just picking out the thing that they think helps their case on non-infringement, I believe. But the fact of the matter is that the applicant only said 80 to 125%. And Judge Moore's question focuses on an interesting point that has my attention, and that is the fact that this 90% confidence level does strike me as more a question of the fact of infringement as opposed to the legal interpretation of the claim. It's like, well, all right, we claim a drug having a CMAX in a range of 80 to 125%, and we're arguing that there is infringement 90% of the time. It seems that the 90% confidence level goes to the fact of infringement and not necessarily to the subject matter claimed, because if we look at this in the context of normal patent infringement, you would look at each individual pill, pill by pill. Either it meets the range or it doesn't meet the range, whereas the 90% confidence level only has relevance in the context of batches of drugs. Your Honor, I think that there is an important difference between non-ANDA cases and ANDA cases, which is that the question for an ANDA case is, what is the product that will likely be sold? Because we don't have any product on the market as it is. And this Court said in the Behr case that if the specification of the ANDA product carves out the claims completely, makes it a fact that the generic product cannot infringe because they have some car out in their specification, then there's no infringement. But the reverse is true as well. If their specification allows them to make infringing product because we're dealing with what is a sort of technical act of infringement, then that's sufficient to show infringement. So I think there are important differences in the ANDA context as opposed to other contexts, and to me that's a very important difference right there. Is this a comfortable time for me to move you on to your next point? Sure. Okay. So the evidence, as I understand it, that was presented on infringement is A is equivalent to B, B is equivalent to C, therefore A must be equivalent to C. Essentially, yes. Essentially. Now, of course, from a statistical standpoint, and that's something that I find interesting, it's entirely possible given a range, and especially a range this broad, that A and B can be equivalent and B and C can be equivalent, but there's no way A and C could be equivalent even 10 percent of the time. Like say the mean, I realize it's not, but it was 125 percent for the equivalence between A and B, and then between B and C another 125 percent. Well, then you actually have a situation where clearly less than 50 percent of the drugs are going to be in that range ultimately. You follow what I'm saying mathematically. Now, I understand you presented additional evidence in the form of the actual means for CMAX in comparison for Parego to Mucinex and Mucinex to Organadin. Am I saying those right? Yes. Okay. It's still entirely statistically mathematically possible for more than 50 percent to be outside the range despite the means, right? Did you also present evidence, or does it exist in the record, because I couldn't find it and it might be there, and so hopefully you'll just direct me to it, for what shape the curve takes that creates that mean? Because obviously if the curve is two tetons, two peaks, one at 80 percent and one at 125, the fact that the mean is smack dab in the middle is sort of irrelevant for the comparison purposes. So I guess what I'm getting at is does data exist such that a fact finder is going to be capable of assessing this level of equivalence, and is it in the record? Yes, the data exists. Yes, it's in the record. But let me explain what the data is. In fact, the CMAX of Parego's product is 98 percent of the CMAX of Mucinex. Right. And the CMAX of Mucinex is 103 percent of the CMAX of Organadin. Yes. And if you look at those studies, the confidence intervals for those two studies, basically two studies, is plus or minus 10 percent. Using that confidence interval of the test of the data that's already in the record, I think the fact finder will be able to say, look, if you're basically virtually identical to the CMAX, then the confidence interval would apply to these tablets, because these tablets don't have this wide range of variation. How do you know that? That's what needs to be there. Is that in the record? Yes. Because simply the numbers that you've just explained, like I said, if it were represented by two tetons, then we're in a bad situation from an equivalent standpoint. All the data is in the record that's reflected in the PK studies that were run, which would have that type of data in the record about what the variances of the tablets from pill to pill. That's what I'm looking for. And that is part of the record? Yes. It's in the record. It relates to the PK study comparing Parego's product to Mucinex and Mucinex's product to Organadin. I didn't see them in the appendix. Do you know if they were provided to us? I don't know if they were. Some of it was provided to you. Well, it's a big appendix. I could have missed it. I'm fairly certain because I can remember seeing it in the appendix. Some of the PK data was provided to the Court, and, of course, it's discussed in the expert reports. My thinking was that a crossover study doesn't necessarily have to be there all the time. A comparison is possible, but if the comparison itself was facially inadequate, then the district court would be exercising a proper gatekeeping role. And what you're saying to me is there is enough information to show this factually in the record. I think it's very important at this point for me to tell you one example of why you don't necessarily need a crossover study or a confidence interval analysis to conclude that the products are bioequivalent. In the Mucinex ANDA, there's two dosage trends, a 1,200 and a 600. Adams compared the 1,200 to organogen, and the FDA said that they were bioequivalent. They never compared the 600 to organogen. The comparison was simply to the 1,200. Yet the FDA said that the 600-million-dollar product was bioequivalent to organogen. Without running the head-to-head study, without having the confidence interval, the FDA still was comfortable with making the judgment that, in fact, the product was equivalent. And we're doing the same thing here, essentially. We have experts in the field. And we know government agencies are totally flawless, and therefore we should rely on them and get lots of money from one party to the next. Well, Your Honor, I think we studied another instance where the FDA said the reason why generics are compared to a reference-licit drug is not just to show that they're bioequivalent to the reference, but to each other. But they never compare one another. So I think it's a policy of the FDA that they can, in fact, show bioequivalence. I see my time is completely up. Yeah. I'll restore your three minutes of rebuttal, and we'll give Mr. Riccozzi an extra three minutes. So thank you very much. Mr. Riccozzi, good morning. Thank you, Judge. Good morning. May it please the Court. William Riccozzi on behalf of the Paraguay Defendants Appellees. I'll begin with the issue of claim destruction. There's no question on what the FDA guidelines require. The only question in here is did they adopt them as their definition of equivalent? We believe they clearly did. What Adams is trying to say now is they just adopted part of them. They adopted a naked rate of 80% to 125%. There's a couple problems with that. First off, they didn't need to cite— Before you get to that, where is the language you rely on saying they've adopted all the guidelines? What does that language say? The language we rely on, Your Honor, is from the file history. It was almost in question-and-answer format, where the examiner during the re-exam had a question and raised on a couple occasions there could be a 112 problem because equivalent is not defined anywhere and we can't tell what to judge by or what to use to compare for equivalent. In response, to get around that 112 issue and avoid it, to secure allowance of the patent, they specifically said one ordinary skill in the art would recognize equivalent as being the FDA bioequivalence guidelines of 80% to 125%. But they didn't say all guidelines. The only thing they recognized as equivalent to me was the guideline, the specific guideline of 80% to 125%. As I gather, your argument is somehow, despite that, they really meant something broader. They meant all the guidelines, including the 90% item. Well, to remove all doubt, Your Honor, yes, because they not only said FDA's bioequivalence guidelines, they actually attached the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book. But you're not arguing that they incorporated that by reference or anything like that. Well, they attached it, Your Honor, and did incorporate it into the file history. So the key here is what would the person... But they didn't incorporate the entirety of the text. They didn't specifically identify what it was that they were referring to or whether they were referring to the entirety of the document. It was simply a reference. They actually... I'm sorry, Your Honor, I didn't mean to interrupt. No, that's fine. Direct me if I'm wrong. They actually not only attached it, they actually cited, I believe, pages 9 and 10, which are the pages that set forth the bioequivalence guidelines themselves. And I think the key here is what would the person of ordinary skill in the art believe after reading that statement and looking at those Orange Book pages that were cited? Well, counsel, let's test your boo-booking knowledge. There's a C-site in advance of that. When people put a C in advance, that usually means it doesn't stand for a direct proposition but rather a relevant one. That's what the blue book says with regard to the word C, with a C-site, as opposed to when you have a quotation or something that you are directly citing, you don't put the C-site in there. So here they have, moreover, one of ordinary skill in the art would recognize equivalence as being the FDA bioequivalence guideline of 80 to 125 percent, and then they include the guidelines with a C-site and they cite the pages which espouse the 80 to 125 percent number. Why doesn't that all just boil down to 80 to 125 percent as what they were claiming and they just wanted to show you where they got it from? Because, Your Honor, there is no such thing, and I think this is key. This is what the skilled person would understand. There is no such thing as a naked 80 to 125 percent range under FDA's bioequivalence guidelines. You don't just find a value like C-max and drop it into the range and say, does it fall within those numbers? That's not how this works, and the skilled person would know that, and if they looked at those pages in the orange book, they would know that FDA would never accept that. Well, that's in the context of an FDA bioequivalence assessment, but that's not what we're talking about here. We're talking about whether in the patent, the reference to a C-max equivalent is anything more than the range that's stated in the document itself, 80 to 125 percent. But that's the key, Your Honor, because you can't divorce the confidence interval from the range because it's not the C-max that has to fall within that range, Your Honor. It's actually the confidence interval. Well, that's if you're arguing bioequivalence. Which is what they said. They said bioequivalence guidelines was exactly the terminology that they used. As a matter of fact, the language from the other parts of the reexam we believe is just as clear. Mr. Ecclesi, I'm not sure it's fair to try to parse this that way and read snippets of this sentence in the abstract. You've got to read the whole sentence, and that's what we're confronted with. And the sentence says, one of ordinary skill in the art would recognize, quote, equivalent, quote, as being the FDA bioequivalence guidelines of 80 to 125 percent. I don't know how you can read that without understanding that the equivalence is related to the range. But if you read it as a whole, Your Honor, bioequivalence guidelines of 80 to 125 percent, one of ordinary skill would interpret that as meaning the confidence interval has to fall within the 80 to 125 percent. Well, that's what I don't get. Why do you conclude that one of ordinary skill in the art would read that to include the 90 percent confidence level? Where does that come from? That comes from the actual Orange Book itself and the FDA guideline. There is no FDA guideline anywhere, and certainly not in the record that was attached to the file history, saying that you can just have a C-max falling within this naked range. The FDA bioequivalence guideline, or even the other language used, the normal bioequivalent range, it is a range that you look to see if the confidence interval falls within. And that's the key, because there is no such thing. I don't understand. If the patentee intended to incorporate not only the 80 to 125 percent, but also the 90 percent confidence range, why didn't they say so? It would have been very simple to say the guidelines of and the confidence, 90 percent confidence range. They didn't. They seem to, when you read the language, just looking at it, it seems as though they selected this particular guideline as the thing they were incorporating. And now you tell us, well, they selected this particular thing, but in addition to that, they also included something else from the guidelines. Not all the guidelines, but something else, another number on a different matter. That's what troubles me about your argument. There would have been no reason, if all they wanted was a range of 80 to 125 percent, and say C-max falls within that range, it's good enough, they wouldn't have needed to cite the FDA's bioequivalence guidelines. There was no reason to cite that. And the problem is, if they're allowed to... Well, their answer to you is that we've cited it, because if we didn't cite it, the examiner would have said, where did you get those numbers from? But what's the basis of those numbers? And the answer is, the basis for those numbers is because the guidelines use it. But that can't be the basis, Your Honor, because there is no such thing as a bare 80 to 125 range. It doesn't exist in the art of determining bioequivalence or equivalence. It's always the confidence interval. If they just meant the range, they didn't need to cite to the Orange Book. They certainly didn't need to attach it to give it support. Now, how does one... Well, maybe they included more than they needed to include, but... Well, now we're getting into, Your Honor, wanting to change things now in litigation because of proof problems. And that's a huge problem, because the person of ordinary skill in the art has to be able to rely on what was in this file history. And the skilled person seeing the Orange Book and seeing FDA's bioequivalence guidelines, that's a mouthful. They don't say to themselves, oh, that's just a range. I don't need to worry about anything else. When they see the bioequivalence guidelines, they know that FDA would never accept under the guidelines just a number falling within that range. They're going to look to the confidence interval. And so the confidence interval... I guess I just don't understand why... I mean, Judge Lynn succinctly stated it, why 90% doesn't go to infringement. I mean, you're comparing two products for infringement purposes, and suppose that 51% of the time your product infringes. Well, in a normal lawsuit, they would be entitled to damages for those 51%, and you would be free to sell the other 49% of the product. If 1% of your product infringed, they would be free to get damages for you on that 1%, and you could sell the other 99%. And so why isn't this whole 90% issue one of infringement and damage assessment rather than one of claim construction? Well, I think it can obviously be both, Your Honor. We believe it's part of claim construction because you can't divorce the confidence interval from this 80% to 125% range. Why, though? Why? Why in the world would any patentee write a patent that said you're only going to infringe my patent if you do it 90% of the time? I mean, it's circular. You're only going to infringe if you infringe 90% of the time. It doesn't make sense. It wouldn't really be a logical claim drafting. In fact, you might even malpractice problems if you write a claim like that. So why would we interpret this claim that way? Possibly, Your Honor. But that leads to bigger problems of interpreting the claim because it's easy or hard to prove infringement, which doesn't make sense either. First, we need to construe the claim based on what they put in the public record. Well, I mean, if you haven't gotten a sense of it already, I mean, I think that the panel sees two very plausible ways to construe this, arguably. And one of them would result, it seems like, in a really nonsensical claim. It's hard for me to understand why anyone would write a claim that way. And the other one is much more logical. And so that's what you're really confronted with at this point. Well, I would respectfully disagree that their position is logical, Your Honor, given what they told the Patent Office. They said FDA's bioequivalence guidelines, and those have real meaning to the person of ordinary state. Well, and if the period had come after the word guidelines, you'd be right. But, Your Honor, the 80 to 125 is not a naked range in the guidelines. If you say all we meant was the 80 to 125% range, then you're just cutting out the bioequivalence guidelines part because you're not going to find a naked range anywhere in those guidelines that you just take a CMAX and drop it into. That's not the way they work. That's not the way they've ever worked. Now, on the infringement evidence itself, we disagree that there's anything in the record that you can just willy-nilly take confidence intervals out of these studies and start comparing them to do a statistical analysis, Your Honor, because we have a problem. This case is not just A to B, B to C, A to C theory. This is actually two proxies being used here because we have the proxy that Paradoke compared its claim against, which is the Mucinex 600-milligram tablet, but that tablet was never compared to a standard IR formulation, ever. You will not find that in this record, not in the joint appendix, not anywhere else in the record flow, because it was never compared. So what they're doing is they're using a proxy that was never compared to a standard IR formulation, and then you have to go to another proxy, the 1,200-milligram Mucinex tablet that was compared to a standard IR formulation but was never compared to the Paradoke product. So you actually have equivalents by proxy and by yet another proxy, and that just can't work under anyone's claim construction. I don't understand. Are you saying that the 1,200-milligram tablet is not just double the 600-milligram tablet but is different somehow? I believe it is double. It is double the 600-milligram tablet, Your Honor. What I'm saying is it was never compared. I'm sorry, the 1,200-milligram was the only thing ever compared to a standard IR formulation to obtain any type of CMAX data. It was never... The 600-milligram is actually the subject of this lawsuit that Paradoke tested its product against in a bioequivalence study was never tested against an IR formulation. Let me ask you a different question. If you took a 1,200-milligram tablet and cut it exactly in half, would you have two 600-milligram tablets? We don't know that, Your Honor. We have no idea how a 1,200-milligram tablet cut in half would perform under these bioavailability tests. Cutting a pill in half like this is hard because you don't know where the concentration of either the immediate release versus the long-acting part lies within it, so you can't just cut the pill in half. But I think Judge Friedman was on to an excellent point, which I'd like you to elaborate on, which is the 600 versus 1,200, we know that data exists comparing one of the two to immediate release, right? Which one is it? The 1,200 data exists? The 1,200 mucin was compared to a standard IR formulation. Did you introduce some evidence to suggest that there's reason to doubt that the 600 would have performed the same way, you know, just cut in half because it's a half-dose? I mean, is there... I think that it sounds like everything we're talking about is so factual that it just seems to me that it's all fact question for a fact-finder on the issue of infringement because what you're saying is, well, you can't compare A to B because B itself wasn't validated. Well, B wasn't validated, but 2 times B was validated, and is there any reason to doubt that B is just half of 2 times B? Well, you haven't presented evidence that would give reason to doubt that. Actually, Your Honor, we have our expert opinion. There's no evidence on what those numbers would be. All the more reason to put it to a fact-finder. But more importantly, Your Honor, E.O. Pine then testified that you can't do that A to B, B to C, C to A for many reasons, not the least of which is you can't get a confidence interval, and even if you could... Now you're hanging your basket on the confidence interval, and I suggest you don't do that because then you don't have two independent arguments on appeal. You've got only one. But there's no comparison data, Your Honor. There isn't any data comparing these things. And that weeps over the fact that we dispute you can even use this comparison legally. We obviously dispute that as a matter of law, you can use this proxy-by-proxy argument. Of course you can. Why can't you? You don't have to have a crossover study in every case. Now, you might have presented an adequate reason to suggest a crossover study would have been required in an individual case, and that's possible, but a crossover study doesn't have to be required in every case. Suppose the parties provide evidence that 100% of the time A is equivalent to B, and 100% of the time B is equivalent to C with exact precision. I mean, that's enough. You don't need a crossover study every time to establish infringement. And it's for the fact finder to decide whether it's required in an individual case. But there is no such evidence in this record. That's the problem. You can search far and wide in this record. Surely, there's plenty of attorney argument, which, while interesting, can't create a question of fact. But you're not going to find that data or any expert testimony on these comparisons because the experts were dealing with the confidence interval issue. They weren't dealing with... Wait, isn't there a C-max of 98% for the comparison between Parego's 600-milligram and Mucinec's 600-milligram, and a C-max of 103% for the second comparison? I mean, don't those exist in the record? I believe in the record, what exists is the bioequivalence data, some of it, for Parego's product against the 600-milligram Mucinec's, which is the reference product. And so all, I guess, my questions directed to opposing counsel were, well, a mean isn't enough to necessarily get over the hurdle because if the mean is a bell curve, then you get over the hurdle, possibly. But if the mean represents some sort of skewed distribution, you don't. And he assured me that evidence existed in the record on this point, even if we didn't have it, and isn't it best just to let the district court figure all that out? Well, we don't believe that evidence is in the record, Your Honor, and I can tell you none of the experts looked at that and opined on that. Well, it doesn't matter whether the experts opined on it. For summary judgment purposes, we're required to look at the entire record and see whether a factual dispute exists. They've clearly articulated one and suggested that exactly the evidence I'm referring to exists in the record. But, Your Honor, they articulated theory, no doubt. Peridot put forth uncontroverted expert testimony that that theory won't work, this proxy-by-proxy theory. Because he hung it all on the 90% confidence interval. I read his testimony. And their only response was, I disagree. He didn't say anything. But if you disagree with the 90% confidence interval, too, then his testimony falls away and it doesn't, you know, shoot the magic bullet through this evidence. But merely saying, I disagree, Your Honor, can't be enough to defeat summary judgment. There would never be summary judgment. Now, Mr. Rucuzzi, before you finish, I just want to ask you a couple more questions on this 90% confidence level. Let's say, hypothetically, a claim calls for a range with a 90% confidence level. It's set forth explicitly in the claim. Improving infringement. Let's suppose you introduce evidence and you show that, well, 90% of the accused drugs fall within this range. So you would argue that there is infringement, correct? Actually, you can't statistically do that, Your Honor, for some of the reasons that Judge Moore expressed, because you're dealing with mean CMAXs, and a confidence interval is the ratio of the CMAXs measured in the same study where the drug product is crossed over from patient, or the test product and the reference product given to the same patient. That's the confidence interval. And you can only calculate it in that way. And that's a problem here. So how would you... So I understand that this is the challenge to prove infringement in that context, given that kind of a claim. Yes. Now, in an ANDA context, where you have no product, how would you establish, how would you prove infringement? Well, the fact of the matter is, we do have a product, Your Honor. It has not been commercialized. Well, I mean, my hypothetical. You have an ANDA with no product. So the question is, how do you establish that there is infringement where you've got a claim that explicitly sets forth a confidence level? Actually, like you do in many other pharmaceutical cases, Your Honor, you test the proposed product. In this case, Parable gave its proposed product to Adams for testing. And they could have tested it against a standard IR formulation under the claim that you just used in your hypothetical. And in doing that, they would have all the data that they need to calculate the confidence interval in the claim and determine, is it falling within the range to be considered equivalent? And in this case, they have the product, and there's no dispute that they did not test it. Or if they did test it, they never produced the data. And that is not in dispute here. Is discovery closed? Discovery is closed, Your Honor. All right. I thank you very much. Mr. Condi, do you have any remarks in rebuttal? I haven't taken any brief, and I don't think I'll need all three minutes that you've kindly allocated. First one is, as Judge Moore and my colleagues pointed out, that some of the PK data is at A15715 of the record, and that data relates to the Mucinix v. Perrigo comparison. It's not the full PK study, so there's even additional data which would address all of the information that you could do whatever analysis you would need. Is it already in the record? It's already in the record. Mr. Riccozzi mentioned that we cited at page 9 and 10 of the FDA guidelines. Will both 9 and 10 talk about the 80 to 125 percent? Another issue that came up with Mr. Riccozzi related to the question of the 600 versus the 1,200 milligram product for Mucinix. In fact, the patent itself says that those two products are dose proportional, which means exactly what you were referring to, Judge Friedman, that they're basically just double the amount, and so you would expect them to behave the same way. And that can be found at the record at 896, column 20, lines 18 to 20. Now, Mr. Riccozzi said that his expert's testimony regarding the head-to-head clinical trial and the need for that to show bioequivalence was uncontroverted. In fact, as we pointed out in our brief, it was highly disputed by our pharmacology expert, Dr. Foster, who actually looked at all the data as opposed to Dr. Bolton, who was a statistical expert who didn't look at any of the data. And Dr. Foster, based on all the data that he reviewed, concluded that, in fact, you can reach the conclusion that Paragol's product is not only equivalent but bioequivalent to an immediate-release dosage form, unless there's any other questions. That's all I have. Okay. Well, thank you very much. I thank counsel for both sides. The case is now submitted. That concludes the arguments this morning. All rise.